**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL–CIO,**

**American Federation of Government Employees, AFL–CIO, Local 1482, William J. Gately, and Michelle Jo Evans, Plaintiffs,**

**v.**

**The UNITED STATES, Defendant.**

**No. 00–130C.**

United States Court of Federal Claims.

May 10, 2000.

---

Claude P. Goddard, Jr., Vienna, VA, for plaintiff. Donald G. Gavin, Daniel J. Donohue, Wickwire Gavin, and Martin Cohen, of counsel.

Mark L. Josephs, U.S. Department of Justice, Washington, D.C., with whom were David W. Ogden, Assistant Attorney General, Director David M. Cohen, and Deputy Director James M. Kinsella, for defendant. Matthew O. Geaery, Defense Supply Center, of counsel.

## OPINION

FIRESTONE, Judge.

This case arises from a solicitation issued by the Defense Logistics Agency ("DLA") for a contract to operate three DLA material

distribution depots. The solicitation was part of a two-step process aimed at determining whether the services described in the solicitation could be performed more economically by a private contractor when compared to the costs of the DLA's in-house personnel ("MEO")[1] performing the same work. In this action brought pursuant to 28 U.S.C. § 1491(b)(1) (1994 & Supp. IV 1998), plaintiffs, two federal employees and their unions,[2] challenge the DLA's final cost comparison which led the DLA to contract out the work.

Plaintiffs contend that the DLA's cost comparison contains mistakes in violation of the relevant sections of Office of Management and Budget Circular No. A-76 (Revised 1999) [hereinafter OMB Circular A-76] and its Supplemental Handbook, as well as the Federal Activities Inventory Reform Act of 1998, Pub.L. No. 105-270, § 2(e), 112 Stat. 2382, 2383 (codified at 31 U.S.C. § 501 note (Supp. IV 1998)) ("FAIR") and the Defense Authorization Act, 10 U.S.C. § 2462(b) (1994).[3] The government argues that plaintiffs do not have standing under the cited statutes to challenge the cost comparison, and therefore, this action should be dismissed. Based on the arguments presented by the parties and discussed below, this court concludes that plaintiffs lack standing and thus, this court dismisses the action.

## FACTS

### A. The DLA Decision

The facts are set forth in the Administrative Record filed with this court on March 22,

2000, and may be summarized as follows. On April 30, 1999, the DLA issued Solicitation No. SPO-770-99-R-7002 ("solicitation") seeking proposals for the performance of defense material distribution services at the Defense Distribution Depot Barstow, California ("Barstow Depot") under a hybrid fixed-price (indefinite delivery time/indefinite quantity) contract for a three-year term, with an option for an additional two years. The performance requirements for the contract were set forth in a Performance Work Statement ("PWS") accompanying the solicitation.

The DLA issued the solicitation in support of a cost comparison study conducted under OMB Circular A-76. OMB Circular A-76 states that it is the general policy of the federal government to rely upon commercial sources to provide the products and services the government needs. *See* OMB Circular A-76 ¶¶ 4-5. OMB Circular A-76 also provides that in-house performance of a commercial activity is authorized if a "cost comparison" demonstrates that the federal agency is operating or can operate the activity at a lower estimated cost than a qualified commercial source. *See id.*

The DLA designed the subject cost comparison study to determine whether the services at the Barstow Depot as described in the PWS could be performed more economically by the DLA's MEO or by a private commercial source. The DLA conducted the cost comparison in two stages, as outlined in

---

**1.** The MEO or "most efficient organization" is not the existing in-house organization, but the organization the agency would establish if it were competing for the work. In other words, the existing organization is allowed to make itself more efficient in order to compete. The A-76 Supplemental Handbook provides that "[a]gencies may consider existing management reinvention, consolidation, re-engineering, personnel classification, market and other analyses in the identification and development of the MEO." Office of Management and Budget, Circular No. A-76, Revised Supplemental Handbook, part I, ch. 3, § E (1996) [hereinafter Supplemental Handbook].

**2.** The individual plaintiffs, William J. Gately, a WG-8 blocker bracer, and Michelle Jo Evans, a GS-09 distribution facilities specialist, are cur-

rently employed at the Barstow Depot. They claim in their accompanying affidavits that they would likely be included in the MEO if the work is retained in house, but are likely to lose their jobs or benefits if EG & G Logistics, Inc. ("EG & G") is allowed to proceed with its contract. The unions, American Federation of Government Employees ("AFGE") and AFGE Local 1482, allege that they represent the named plaintiffs and other similarly situated Barstow Depot workers who would also likely be included in the MEO, but will lose either their job or benefits if EG & G is allowed to proceed.

**3.** Plaintiffs focus their objections on the portions of these statutes and OMB Circular A-76 that govern cost comparisons used to determine whether to contract out an activity, following a public-private competition.

part II of the Supplemental Handbook and in the solicitation. First, the DLA conducted a competition among commercial sources to find the lowest-priced, technically-acceptable proposal. Second, the DLA evaluated the selected commercial source's proposal against the MEO's proposal.

In accordance with this process, the DLA received seven proposals from interested private commercial sources. The DLA established the competitive range and held discussions with the various private offerors within the range, including EG & G Logistics, Inc. ("EG & G"), the final contract awardee in this case. EG & G had initially submitted a proposal to perform the work for a fixed price of $14.6 million dollars, which it then reduced to $11.9 million dollars in response to amendment 0011 to the solicitation, which was issued following discussions between the DLA and offerors in the competitive range.[4]

On November 29, 1999, the DLA selected EG & G as the best value offeror for comparison with the MEO. On that same date, the DLA opened the MEO's sealed cost estimate of $17 million, which was based on a workforce of 65 employees.[5] Before conducting the final cost comparison, which requires entry of both the private and the MEO cost proposals on a specified form, the DLA sought to confirm that both proposals were based on the same scope of work and levels of performance. Following that evaluation, the DLA issued solicitation amendment 0013 to allow EG & G to revise its bid to reflect the same workload estimate used by the MEO. On December 17, 1999, EG & G submitted its final proposed price of $11,852,150, based on a workforce of 62 employees.

While the cost comparison process was pending, Congress enacted the FAIR Act, which now governs the process for contracting out to private sources services the government currently provides for itself. Under FAIR, agencies are required to identify those activities that are "not inherently governmental" and thus, appropriate for contracting out to private sources. *See* FAIR § 2, 83 Stat. at 2382–83. The agency is then required to list those activities that are not inherently governmental with the OMB. *Id.* The statute further provides that when determining whether to contract with a private source for an activity on the list on the basis of a cost comparison with an MEO, "the head of the executive agency shall ensure that all costs ... are considered and that the costs considered are realistic and fair." *Id.* § 2(e), 83 Stat. at 2383.[6] The distribution services for the Barstow Depot at issue in this case were put on the FAIR list on December 30, 1999.

On January 5, 2000, in accordance with OMB Circular A–76, FAIR § 2(e), and 10 U.S.C. § 2462(b), the DLA conducted a formal cost comparison. First, the DLA entered the MEO's cost estimate of $17,032,459. Then, the DLA entered EG & G's unadjusted cost estimate of $11,852,150. When the cost comparison was completed, taking into account a minimum conversion differential of $1,263,433,[7] the total in-house cost of performance of $17,032,459 was found to be approximately $2.5 million more than the adjusted cost of EG & G's performance of $14,521,719.

4. Plaintiffs allege that EG & G never provided any justification for this lower bid.

5. The MEO's proposed workforce of 65 employees represented a 59% reduction from current employee levels at the Barstow Depot.

6. The cost comparison language contained in section 2(e) of the FAIR Act, which is quoted above, is virtually identical to the language of the cost comparison provision in subsection (b) of 10 U.S.C. § 2462, governing Department of Defense procurement decisions. Section 2462(b) provides that when determining whether to contract with a private source the performance of a Department of Defense function on the basis of a cost comparison with an MEO, "the [head of the agency] shall ensure that all costs considered ... are realistic and fair." 10 U.S.C. § 2462(b). The plaintiffs here challenge DLA's compliance with the cost comparison study "realistic and fair" requirements, under both FAIR and 10 U.S.C. § 2462(b), as well as OMB Circular A–76.

7. The minimum conversion differential was calculated as ten percent of personnel costs and is established to ensure that the government will not contract out services for marginal savings. *See* Supplemental Handbook, part II, ch. 4, § A.1. Accordingly, a cost difference must be more than the minimum cost differential for an agency to replace in-house performance with a private contract.

Based upon these results, the DLA made a tentative determination to contract out the Barstow Depot operations to EG & G.

Pursuant to OMB Circular A–76 and 48 C.F.R. § 52.207–2(c)(1), the award remained tentative until the completion of a public review period and resolution of any administrative appeals. OMB Circular A–76 allows for administrative appeals by various parties, including potentially displaced federal workers and their unions. *See* Supplemental Handbook, part I, ch. 3, § K. OMB Circular A–76 further provides that it does not "[e]stablish and shall not be construed to create any substantive or procedural basis for anyone to challenge any agency action or inaction on the basis that such action or inaction was not in accordance with this Circular," except for administrative appeals under the Supplement or as provided by FAIR. OMB Circular A–76 ¶ 7 and Supplemental Handbook, part I, ch. 3, § K.7.

AFGE, Barstow Depot employees, and EG & G each submitted an administrative appeal to the DLA Appeal Authority ("Appeal Authority"). The Appeal Authority sustained a number of appeal issues asserted by plaintiffs and calculated the total effect of these issues on the cost comparison. This calculation resulted in a maximum potential decrease of $1,469,421 in the MEO's proposed price and maximum potential increase of $62,284 in EG & G's price. The Appeal Authority determined that, even after these potential adjustments, the price differential between the MEO's price and EG & G's price was $2,242,468, or $979,035 above the minimum conversion differential. The Appeal Authority ultimately upheld the DLA's cost comparison, stating that "I did not identify any significant problems with the chal-

lenged cost items, either individually or in the aggregate, such that the tentative decision might be considered unsupported or in error."[8]

## B. This Action

On March 16, 2000, following the Appeal Authority's March 9, 2000 decision, plaintiffs filed this bid protest action challenging the DLA's final decision to award the contract to EG & G. Accompanying their complaint, plaintiffs also filed an application for a temporary restraining order and a motion for a preliminary injunction, seeking to enjoin performance of the contract. Based upon the government's representations to this court that the agency would temporarily postpone performance, by order dated March 17, 2000, this court denied plaintiffs' application for a temporary restraining order and consolidated the motion for preliminary injunction with resolution of the case on the merits.

In this action, plaintiffs challenge the final DLA cost comparison on the grounds that the DLA failed to conduct a proper cost comparison in violation of OMB Circular A–76, 10 U.S.C. § 2462(b), and section 2(e) of the FAIR Act. In particular, plaintiffs allege that the DLA violated the above-noted statutes and regulation by failing to confirm EG & G's costs through a cost realism analysis.[9] Plaintiffs contend that nothing in the record explains EG & G's $11.8 million price, which is undisputably 46% lower than the next lowest private contractor proposal to perform the work. Plaintiffs contend that EG & G seriously underbid the work. In addition, plaintiffs argue that EG & G's final bid understates or omits numerous other costs that were included in the MEO price. Most im-

8. The Appeal Authority did not address the appeal issues raised by EG & G because it sustained the decision of the agency after evaluating the appeals of plaintiff AFGE and the Barstow Depot management employees. At that point, the EG & G appeal became moot, as it could not change the outcome.

9. In support of their claim, plaintiffs cite 48 C.F.R. § 15.404–1(d), which provides that a cost realism analysis is required to be performed on cost-reimbursement contracts to determine the probable cost of performance for each offeror. Pursuant to 48 C.F.R. § 15.404–1(d)(3), cost real-

ism analysis *may* also be used to evaluate fixed-price contracts, such as the one at issue in this case, but is *not* required for such contracts. *Id.* (emphasis added). In addition, plaintiffs contend that a cost realism analysis was required by the solicitation. The solicitation lists "cost/price" as the most important evaluation factor for an award under the solicitation. *See* solicitation at 226–27. The solicitation further identifies "realism" and "completeness" of the proposed costs in relation to the required work under the contract among the bases for evaluating the "cost/price" factor. *Id.* at 227.

portantly, plaintiffs argue that EG & G violated the Services Contract Act ("SCA"), 41 U.S.C. §§ 351–354 (1994), and its implementing regulations, 48 C.F.R. § 52.222–41, by using improper labor classifications. Plaintiffs contend that this resulted in over $900,-000 in illegal savings.[10] Plaintiffs also argue that EG & G failed to include costs for computer support for data processing, overtime pay for mobile crane/rigging operations, various transition and refurbishing costs, and time for sick leave and training.

The government argues that this court must dismiss this action because, regardless of whether the cost comparison was proper, these plaintiffs lack the requisite standing to challenge the cost comparison. The government contends that every court to examine similar challenges by similarly situated plaintiffs, regarding compliance with OMB Circular A–76 and identical cost comparison statutes, has concluded that displaced federal employees and their unions do not have standing to challenge cost comparisons. The government further argues that, should this court conclude that these plaintiffs have standing, the government is entitled to judgment on the administrative record. According to the government, where as here, EG & G was awarded a fixed-price contract, the government was not required to perform a cost realism analysis because EG & G is obligated to perform at the contract price whether or not its costs are realistic. In addition, the government contends that EG & G factored in all necessary costs in its final bid. The court heard oral argument on May 1, 2000.

## DISCUSSION

The threshold issue in this case is whether these plaintiffs may maintain this action challenging the government's compliance with the cost comparison requirements of 10 U.S.C. § 2462(b) and section 2(e) of the FAIR Act, which is now implemented under OMB Circular A–76. The government contends that these plaintiffs lack standing to challenge the alleged statutory violations of

FAIR and 10 U.S.C. § 2462(b) because they are not "interested parties" within the meaning of the Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub.L. No. 104–320, § 12, 110 Stat. 3870, 3874 (codified at 28 U.S.C. § 1491(b)(1)), which gives the Court of Federal Claims ("COFC") jurisdiction over bid protest cases. The Tucker Act provides in relevant part as follows:

> *Both the Unite[d] States Court of Federal Claims and the district courts of the United States* shall have jurisdiction to render judgment on an action by an *interested party objecting to* a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or *any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.* Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

28 U.S.C. § 1491(b)(1) (emphasis added).

## A. "Interested Party" Under the ADRA

■ Although the ADRA allows only "interested parties" to maintain a suit to challenge a procurement decision, the ADRA does not define "interested party." The government contends that in such circumstances this court should look to the definition of "interested party" Congress provided in the Competition in Contracting Act ("CICA"), Pub.L. No. 98–369, 98 Stat. 1175 (codified as amended in scattered sections of 10, 31, and 41 U.S.C.), which governs administrative bid protest jurisdiction before the General Accounting Office ("GAO"). CICA defines "interested party" to mean "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." 31 U.S.C. § 3551(2) (Supp. IV 1998).

---

10. Plaintiffs note that although the AFGE did not raise the labor classifications issue before the Appeal Authority, it is properly before this court because it was raised before the Appeal Authority

by the Barstow Depot employees, and may be properly raised for the first time in court, regardless of whether it was raised below.

The government contends that engrafting CICA's definition of "interested party" onto the ADRA assures that only those "actual or prospective bidders" with a direct financial interest in the procurement have standing to sue. The government goes on to note that the GAO, in applying the CICA definition, has expressly held that unions representing potentially displaced federal workers, like AFGE here, do not have standing to challenge a procurement to contract out services that were previously performed by government employees because they are not "actual or prospective bidders." *See American Fed'n of Gov't Employees,* B–219590, 219590.3, 86–1 CPD ¶ 436, 1986 WL 63479 (Comp.Gen. May 6, 1986); *National Fed'n of Fed. Employees Local 2049,* B–220838, 85–2 CPD ¶ 454, 1985 WL 53480 (Comp.Gen. Oct.23, 1985); *see also* GAO letter to Sen. James Sasser, 1986 WL 63592 (Comp.Gen. Sept.2, 1986). The government maintains that because these plaintiffs do not have standing under CICA, they should not be given standing under the ADRA.[11]

Plaintiffs argue in response that this court should not limit the definition of "interested party" in the ADRA to the CICA definition. They argue that the term "interested party" should be given its broadest possible meaning and should include anyone who has a direct economic interest in the procurement award, regardless of whether or not they could bid. Plaintiffs suggest that the ADRA allows for review of procurement decisions by any person who participated in the procurement process. Plaintiffs argue that because they have a direct economic interest (in that they may lose their jobs or benefits) and participated in the agency procurement process, they have standing under the ADRA to challenge the cost comparison study underlying the ultimate procurement decision of the DLA.

Whether potentially displaced federal employees and their unions are "interested parties" under the ADRA who may challenge an alleged "violation·of statute or regulation in connection with a procurement" is an issue of first impression in this court. Although most members of the Court of Federal Claims have held that the term "interested party" under the ADRA is not limited to those parties covered by CICA, none have had to address the issue squarely. *See, e.g., Phoenix Air Group, Inc. v. United States,* 46 Fed.Cl. 90, 101–02 (2000); *Winstar Communications, Inc. v. United States,* 41 Fed.Cl. 748, 756 (1998); *CCL, Inc. v. United States,* 39 Fed.Cl. 780, 789–90 (1997); *Delbert Wheeler Constr., Inc. v. United States,* 39 Fed.Cl. 239, 245 & n. 11 (1997), *aff'd,* 155 F.3d 566 (Fed. Cir.1998) (table); *ATA Defense Indus., Inc. v. United States,* 38 Fed.Cl. 489, 494 (1997). In each of the above-cited cases, the Court ultimately determined that the plaintiffs were actual or prospective bidders who could satisfy CICA's "interested party" test.[12] That is not the case here. No one argues that these plaintiffs are actual or prospective bidders. As such, this court must decide whether these plaintiffs have standing as "interested parties" under the ADRA to challenge the statutes and regulations they claim were violated in connection with this procurement. To decide this issue, this court must look to the language of the ADRA, its purpose, and its legislative history, to determine whom Congress intended to be an "interested party."

Prior to the enactment of the ADRA, jurisdiction over bid protests was divided between the COFC, which heard pre-award bid protest actions under the Tucker Act, 28 U.S.C.

---

**11.** In addition, the government argues that the Federal Circuit has looked to the same definition of "interested parties" as appears in CICA in determining the scope of the COFC's jurisdiction under the Tucker Act before it was amended by the ADRA. *See Federal Data Corp. v. United States,* 911 F.2d 699, 703 (Fed.Cir.1990) (citing a definition for "interested party" in the since-repealed statute governing bid protest actions in front of the General Services Board of Contract Appeals that is identical to the CICA definition of "actual or prospective bidder"). There is no question but that the COFC has looked to the jurisdictional statutes for the GAO and Contract Boards in defining its own jurisdiction both before and after the ADRA was enacted.

**12.** Some members of the COFC have held that our jurisdiction is the same as the GAO's under CICA. *See, e.g., Ryan Co. v. United States,* 43 Fed.Cl. 646, 657 n. 17 (1999); *Cincom Systems, Inc. v. United States,* 37 Fed.Cl. 663, 669–70 (1997). For the reasons stated above, this court respectfully disagrees.

§ 1491(a), and the federal district courts, which heard post-award bid protest actions under the Administrative Procedure Act, 5 U.S.C. §§ 702, 704 (1994). Congress enacted the ADRA in 1996 to expand the jurisdiction of both the COFC and the federal district courts to allow both courts to hear "the full range of cases previously subject to review in either system." *See* 142 Cong. Rec. S11848–01, S11849–50 (daily ed. Sept. 30, 1996) (statement of Sen. Levin). To understand fully whom Congress intended to have standing under this new jurisdictional grant, this court must examine who had standing in either court under each forum's pre-ADRA jurisdiction over bid protest cases.

Before Congress enacted the ADRA, the federal district courts heard post-award bid protest challenges to procurement decisions under the waiver of sovereign immunity provided for under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702. *See Scanwell Labs., Inc. v. Shaffer,* 424 F.2d 859 (D.C.Cir.1970). A party has standing to bring an action under the APA if that party is "a person ... adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. The court in *Scanwell* interpreted this provision to mean that "one who makes a prima facie showing alleging [that the agency decision was arbitrary or capricious] has standing to sue [as an aggrieved person] under section 10 of the Administrative Procedure Act." *See Scanwell,* 424 F.2d at 869.

Accordingly, under *Scanwell,* the federal district courts exercised jurisdiction under the APA over bid protest cases brought by a party challenging a government procurement decision based on an alleged violation of a procurement-related statute. Under this authority, federal district courts exercised jurisdiction over a broad range of plaintiffs who claimed standing under the APA. *See Diebold v. United States,* 947 F.2d 787, 810–11 (6th Cir.1991) (holding that the government's decision to privatize an activity was subject to review under the APA, but remanding the case to determine whether displaced federal employees and their union had standing to maintain the suit); *see, e.g., Contractors Eng's Int'l, Inc. v. U.S. Department of Veter-*ans *Affairs,* 947 F.2d 1298, 1300 (5th Cir. 1991) (holding that whether subcontractor has standing to challenge agency action depends on whether plaintiff has standing under traditional APA standing requirements).

The COFC and its predecessors also exercised jurisdiction over bid protest cases. The COFC heard challenges brought by disappointed bidders based on the implied-in-fact contract found to exist between the government and bidders on federal procurements, under which the government has a duty to fairly and honestly evaluate bids. *See Southfork Sys., Inc. v. United States,* 141 F.3d 1124, 1132 & n. 5 (Fed.Cir.1998) (decided under "the law as it stood prior to the 1996 amendments"); *United States v. John C. Grimberg Co.,* 702 F.2d 1362, 1367 (Fed. Cir.1983)(*en banc*); *Heyer Prods. Co. v. United States,* 140 F.Supp. 409, 413, 135 Ct.Cl. 63, 70–71 (1956). This jurisdiction was based on the Tucker Act, which authorizes the COFC to "render judgment upon any claim against the United States founded upon ... any express or implied contract." 28 U.S.C. § 1491(a)(1) (1994). Disappointed bidders were the only parties who had standing to bring a bid protest in this context, because they were the only parties who could be construed to have this implied contractual relationship with the government. *See Motorola, Inc. v. United States,* 988 F.2d 113, 114 (Fed.Cir.1993); *Control Data Sys., Inc. v. United States,* 32 Fed.Cl. 520, 524 (1994).

When Congress enacted the Federal Courts Improvement Act of 1982 ("FCIA"), Pub.L. No. 97–164, 96 Stat. 25, it amended the Tucker Act to include exclusive jurisdiction in the COFC to enter declaratory or injunctive relief in *pre-award* challenges to procurement decisions. *See* 28 U.S.C. § 1491(a)(3) (repealed by the ADRA § 12, 110 Stat. at 3874); *John C. Grimberg,* 702 F.2d at 1367. Section 1491(a)(3) provided that:

[t]o award complete relief on any contract claim *brought before the contract is awarded,* the court shall have *exclusive* jurisdiction to grant declaratory judgments and such equitable and extraordinary relief as it deems proper, including but not limited to injunctive relief.

28 U.S.C. § 1491(a)(3) (repealed by the ADRA § 12, 110 Stat. at 3874) (emphasis added).

This jurisdictional divide between the federal district courts which heard post-award bid protest challenges and the COFC which heard pre-award bid protest challenges was not lost on Congress. To the contrary, Congress expressly indicated in the House and Senate reports giving this court pre-award bid protest jurisdiction under the FCIA, that federal district courts would continue to have jurisdiction to hear complaints challenging post-award decisions under the APA. *See* S. REP. No. 97–275, at 22–23, *reprinted in,* 1982 U.S.C.A.A.N. 11, 32–33 ("[T]he committee does not intend to alter the current state of the substantive law in this area. Specifically, the Scanwell doctrine as enunciated by the D.C. Circuit Court of Appeals in 1970 is left intact. *See Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859 (D.C.Cir.1970)."); H.R. REP. No. 97–312, at 43 (1981) ("It is not the intent of the Committee to change existing caselaw as to the ability of parties to proceed in the district court pursuant to the provisions of the Administrative Procedure Act in instances of illegal agency action. See, e.g. *Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859 (D.C.Cir.1970)."). Rather, under the FCIA, Congress specifically expressed an intent to continue divided bid protest jurisdiction in this court and the federal district courts, stating that "[t]he dual questions of whether these powers should even be broader and of whether they should be exclusive of the district courts will have to wait for a later date." H.R. REP. No. 97–312, at 43.

After 10 years, some in Congress came to believe that this divided jurisdictional approach was inefficient because it resulted in a lack of uniformity of law and "unnecessary and wasteful litigation over jurisdictional issues." *See* 142 Cong. Rec. at S11848–49 (statements of Sens. Cohen and Levin).

Eventually, in 1993, the congressionally-sponsored Acquisition Law Advisory Panel (the so-called "section 800 Panel" of the National Defense Authorization Act for Fiscal Year 1991, Pub.L. No. 101–510, § 800, 104 Stat 1485, 1586 (1990)),[13] recommended to Congress that it should end this jurisdictional division and consolidate all challenges regarding procurement award decisions in the COFC. *See* 142 Cong. Rec. at S11849 (statement of Sen. Levin).

Congress did not adopt the full recommendation of the Advisory Law Panel. Instead, Congress enacted the current version of the ADRA, which amended the COFC's Tucker Act jurisdiction to give both the COFC and the federal district courts coequal jurisdiction over pre- and post-award procurement decisions. The legislation further provides that after four years, unless specifically extended by Congress, federal district court jurisdiction over award decisions will expire.[14] Senator Carl Levin, the legislation's sponsor, explained the purpose of the changes when he introduced the ADRA:

> The revised bill we are taking up today contains a compromise provision that would consolidate the jurisdiction of the Court of Federal Claims and the district courts. For 4 years, the consolidated jurisdiction would be shared by the Court of Federal Claims and the district courts. *Each court system would exercise jurisdiction over the full range of bid protest cases previously subject to review in either system.* After 4 years, the jurisdiction of the district courts would terminate, and the Court of Federal Claims would exercise exclusive judicial jurisdiction over procurement protests.

*Id.* at S11849–50 (emphasis added).

Thus, in enacting the ADRA, Congress intended to give the COFC "the full range of

---

**13.** Section 800 authorized the Under Secretary of Defense for Acquisition to establish an advisory panel to review all laws affecting the DOD acquisition process in order to streamline the procurement process. *See* § 800, 104 Stat. at 1586.

**14.** Section 12(d) of Pub.L. No. 104–270 provided the following sunset provision:

> [t]he jurisdiction of the district courts of the United States over the actions described in section 1491(b)(1) of titled 28, United States Code ... shall terminate on January 1, 2001 unless extended by Congress.

28 U.S.C. § 1491 note (Supp. IV 1998).

bid protest cases previously subject to review in either system." *Id.* Accordingly, the jurisdiction of the COFC now includes jurisdiction to hear the bid protest cases that were previously heard exclusively in the federal district courts, in addition to the same bid protest jurisdiction it exercised prior to the ADRA.[15]

Because the federal district courts' jurisdiction was not limited by an implied-in-fact contract theory to actions filed by "actual or prospective bidders," the COFC's jurisdiction today should not be limited to claims by such persons. Rather, Congress clarified that the COFC, like the federal district courts, would be able to hear claims based on *"any alleged violation of statute or regulation in connection with a procurement or proposed procurement."* 28 U.S.C. § 1491(b)(1) (emphasis added). In this last phrase, Congress created a parallel to the claims previously heard exclusively by federal district courts under the APA, *i.e.*, those claims brought by a "person ... adversely affected or aggrieved by agency action within the meaning of a relevant statute."[16] 5 U.S.C. § 702. In construing the ADRA, this court would fail to give effect to the language of the statute, as well as Congress' clearly stated intent to grant coequal forums, if it excluded parties who previously would have had standing to bring a bid protest action in the federal district courts under the APA from the scope of "interested party" under the ADRA.

In view of the foregoing, this court concludes that the ADRA does not limit standing to parties who meet the definition of "interested party" under CICA. Rather, in accordance with the words of the ADRA and its legislative history, this court concludes that the COFC may also hear challenges to procurement award decisions brought by persons who would have had standing in federal district court under the APA to challenge that same procurement decision.[17]

## B. APA Standing Requirements

■ The requirements for establishing standing under the APA are well settled. Claimants challenging an agency decision under the APA must demonstrate that: (1) they have suffered sufficient "injury-in-fact;" (2) that the injury is "fairly traceable" to the agency's decision and is "likely to be redressed by a favorable decision;" and (3) that the interests sought to be protected are "arguably within the zone of interests to be protected or regulated by the statute ... in question." *National Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 488, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998) (citations omitted) (alteration in original); *Bennett v. Spear*, 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (citations omitted).

With respect to the first inquiry, plaintiffs allege that they satisfy the injury-in-fact test because they stand to lose their jobs and job benefits if the private contract award is implemented. Second, plaintiffs contend that if the procurement is set aside, as federal employees likely to be in the MEO, their injury would be redressed. Plaintiffs further contend that they satisfy the zone-of-interests test because they are within the zone of interests to be protected by the cost comparison statutes they allege were violated, name-

15. Likewise, under this court's reading of the ADRA, until the sunset provision takes effect in January 2001, federal district court jurisdiction over bid protest cases now includes bid protest cases that were previously subject to review exclusively in the COFC, in addition to bid protest cases that were heard under the APA.

16. The fact that Congress enacted a sunset provision as part of the ADRA that terminates the federal district courts' authority to hear bid protest actions in 2001 bolsters this interpretation. It would not make sense for Congress to eliminate federal district court as a bid protest forum if it did not believe that the COFC would be available to hear those cases.

17. In looking to the APA to define "interested party" standing, the court notes that there are other terms in the statute, including the term "Federal agency," which require definition and which may or may not be limited by the APA. The purpose of the ADRA is to grant both the COFC and federal district courts "the *full range* of jurisdiction previously exercised in *either system*." 142 Cong. Rec. at S11849–50. Therefore, if the COFC had jurisdiction, prior to the enactment of the ADRA, over "Federal agency" procurement decisions that were beyond the reach of federal district courts under the APA, the ADRA does not diminish that jurisdiction. *See Hewlett–Packard Co. v. United States*, 41 Fed.Cl. 99, 104 (1998).

ly section 2(e) of FAIR and 10 U.S.C. § 2462(b).[18]

The government contends, in response, that plaintiffs do not satisfy the injury-in-fact test because their alleged injuries are too speculative to establish standing. The government argues that until the private contract is implemented and the individual plaintiffs actually lose their jobs or benefits, they cannot show that they, in fact, have been harmed.[19] The government notes that under the rules governing the contracting-out process, displaced federal workers have various rights, including the right of first refusal to work for the new contractor. *See* 48 C.F.R. § 52.207–3. Thus, the government argues, until the process is played out, it is not clear who, if anyone, will be harmed by the contracting-out decision.

Further, the government argues that plaintiffs' harm in this case is not traceable to the alleged cost comparison violations, but stems from the initial decision to privatize the work, which plaintiffs do not challenge. In that connection, the government argues that, even if the plaintiffs were to win their challenge and the MEO were to do the work, more than half of the present federal workers would be out of jobs. The government contends that in such circumstances, the harm plaintiffs argue here is similar to the harm alleged by displaced federal workers in *American Fed'n of Gov't Employees*

("AFGE") v. Clinton, 180 F.3d 727, 731 (6th Cir.1999), in which the Sixth Circuit held that individual federal employees could not show that their harm was traceable to violations in the contracting-out process. In that case, the Sixth Circuit found that the displaced workers' harm stemmed from the threshold decision to privatize the work in the first instance.[20] *See id.* at 732 (holding that plaintiffs' loss "results most clearly from the unchallengeable and unchallenged decision to close bases").

Finally, the government contends that, even if these plaintiffs can show injury-in-fact that is fairly traceable to the agency decision, they are not within the zone of interests to be protected under the statutes that they allege were violated. As discussed in greater detail below, the government contends that displaced federal workers and their unions may not challenge cost comparisons undertaken to provide the "best value to the American taxpayer." *See infra* pp. 597–98. The government argues that every court to hear a similar challenge by displaced workers challenging cost comparisons under 10 U.S.C. § 2462(b), which contains the identical cost comparison language now in FAIR, has determined that displaced federal workers and their unions do not have standing to challenge the cost comparison process. *See, e.g., American Fed'n of Gov't Employees ("AFGE") v. Cohen,* 171 F.3d 460, 470–71

---

**18.** In addition, while plaintiffs claim they also are within the zone of persons covered by OMB Circular A–76, they do not claim that A–76 provides them with judicial standing. Because OMB Circular A–76 is an executive order and not a statute or regulation, it does not by itself confer any rights to judicial review. *See National Fed'n of Fed. Employees ("NFFE") v. Cheney,* 883 F.2d 1038, 1043 (D.C.Cir.1989).

**19.** Because the union-plaintiffs' standing is derivative of their members' standing, unless the individual plaintiffs can establish standing, the unions' standing will also fail. *See American Fed'n of Gov't Employees ("AFGE") v. Clinton,* 180 F.3d 727, 733 (6th Cir.1999); *American Fed'n of Gov't Employees ("AFGE") v. Cohen,* 171 F.3d 460, 465 (7th Cir.1999).

**20.** This court notes that this traditional standing inquiry into whether plaintiffs' harm is fairly traceable to the agency decision is also required by the ADRA, which provides that a person must show that the alleged statutory violation arises

"in connection with [the challenged] procurement." 28 U.S.C. § 1491(b)(1). Thus, while the court recognizes that the ADRA provides "sweeping" jurisdiction, *see Ramcor Servs. Group v. United States,* 185 F.3d 1286, 1289 (Fed.Cir. 1999), the ADRA still requires that a party demonstrate standing, whether in federal district court or the COFC. *See Massachusetts Bay Trasp. Auth. v. United States,* 21 Cl.Ct. 252, 257–58 (1990), *rev'd on other grounds,* 129 F.3d 1226 (Fed.Cir.1997) ("Although established under Article I, the [COFC] traditionally has applied the case or controversy requirement unless jurisdiction conferred by Congress demands otherwise."); and cases cited therein.

In this instance, this court finds that plaintiffs satisfy this ADRA-standing requirement because whether the cost comparison performed by the DLA was improper, as plaintiffs allege, goes to the very heart of the procurement decision and thus, their injury is "fairly traceable" to the agency decision and would be redressed by setting the procurement decision aside.

(7th Cir.1999); *National Fed'n of Fed. Employees ("NFFE") v. Cheney*, 883 F.2d 1038, 1050 (D.C.Cir.1989). The government contends that these plaintiffs have not presented any basis for departing from these precedents.

### C. Plaintiffs Are not Within the Zone of Interests of "FAIR" or 10 U.S.C. § 2462

Because this court agrees with the government that these plaintiffs are not within the zone of interests to be protected by the statutes that they allege were violated, it need not reach the injury-in-fact question.[21] Although this court concludes that plaintiffs' alleged injuries are fairly traceable to the procurement decision, *i.e.,* injuries based on statutory violations "in connection with [the challenged] procurement," they cannot show that they are within the zone of interests protected by the provisions of the statutes that they claim were violated. Accordingly, they cannot establish that they are "interested parties" under the ADRA.

During their argument before this court, plaintiffs focused their standing argument on the alleged violation of section 2(e) of FAIR, which they claim distinguishes this case from earlier cases that were decided under 10 U.S.C. § 2462(b). Thus, this court will focus its analysis on FAIR as well. As discussed above, Congress enacted FAIR in 1998 to encourage the federal government to contract out to private sources those governmental services that are "not inherently governmental in nature." As its principal sponsor, Senator Craig Thomas stated in introducing the final bill in the Senate that Congress intended FAIR to "codif[y] a process to assure government reliance on the private sector to the maximum extent feasible." 144 Cong. Rec. S9104–02, S9105 (daily ed. July 28, 1998) (statement of Sen. Thomas). To

this end, FAIR establishes a process that directs federal agencies to review their activities annually and to establish a list of those activities that are "not inherently governmental," and therefore appropriate for contracting out to private sources. *See* FAIR § 2(a), 112 Stat. at 2382.

Section 3(b) of FAIR identifies certain persons, including federal employees and their unions, as "interested parties" who "may submit to an executive agency a challenge of an omission of a particular activity from, or an inclusion of a particular activity on, a list ... under section 2[(a) of this Act]." *Id.* § 3(a)-(b), 112 Stat. at 2383. Once an activity is on the list, the agency must make the activity available for competition. *See id.* § 2(d), 112 Stat. at 2383. Thereafter, if the agency is required to conduct a cost comparison between the private source and in-house performance of the work, FAIR requires that "all costs ... are considered and that the costs considered are realistic and fair," *see id.* § 2(e), 112 Stat. at 2383, in order to ensure "best value to the American taxpayer," 144 Cong. Rec. at S9104 (statement of Sen. Thomas).

Congress enacted the final FAIR legislation after much debate and compromise. Indeed, the predecessor FAIR bills, entitled the "Freedom from Government Competition Act," contained very different language from the language ultimately enacted. *See* 144 Cong. Rec. at S9104–05 ("[T] measure reported ... is significantly different than S. 314 as introduced."). The original bills, H.R. 716 and S. 314, mandated federal agencies to "procure from sources in the private sector all goods and services that are necessary for or beneficial to the accomplishment of authorized functions of the agency," except under four limited exceptions. H.R. 716, 105th Cong. § 3(a) (1997); S. 314, 105th Cong.

---

**21.** If this court were to reach the issue, however, it would conclude that these plaintiffs satisfy the injury-in-fact test. There is no question but that some union members will lose the opportunity to retain their jobs as members of the MEO because of the cost comparison results. Their job loss is reasonably traced to the alleged errors in the cost comparison and would be redressed if they were to prevail. Thus, this case is distinguishable from *AFGE v. Clinton* and more like *Nation-*

*al Air Traffic Controllers Assoc. v. Pena*, 944 F.Supp. 1337, 1345–46 (N.D.Ohio 1996), where on remand from the Sixth Circuit, the court found that air traffic controllers employed by the Federal Aviation Administration ("FAA") and their union had standing to challenge the FAA's plan to privatize air traffic control responsibilities at federal facilities. Indeed, the government has not offered any factual evidence to contest this conclusion.

§ 3(a) (1997). Based on "many months of discussions among both the majority and minority on the committee, OMB, Federal employee unions [including AFGE], and private sector organizations," Congress substantially modified the FAIR legislation that was eventually enacted to reflect "a consensus and compromise." *See* 144 Cong. Rec. at S9104 (statement of Sen. Thomas). The final legislation establishes a procedure for identifying and listing activities that should be made available for contracting out. In addition, the final bill allows for public-private competitions. Senator Thomas identified this later compromise as a significant revision. *See id.* (stating, "I revised my bill when introducing it last year to include such competitions").

Plaintiffs argue that because they are included in the definition of an "interested party" for the purpose of challenging the lists developed under section 2(a) of FAIR, and because FAIR preserved the notion of public-private competitions, their interests are within the zone of interests to be protected under the entire statute.

Although the plaintiffs' arguments have some surface appeal, upon closer scrutiny, it is clear that plaintiffs' interests with respect to cost comparisons are not within the zone of interests protected under FAIR. In the plain language of FAIR, Congress specifically distinguishes between the agency's decision to place a particular activity on the list to be contracted out, *see* FAIR § 2(a), 112 Stat. at 2382, and the agency's decision to contract out to a particular source, *see id.* § 2(d)-(e), 112 Stat. at 2383. Section 3(a) of FAIR is cognizant of this distinction and expressly limits authorized challenges to *"an omission of a particular activity, or the inclusion of a particular activity on . . . a list*

under section 2."[22] *Id.* § 3(a), 112 Stat. at 2383 (emphasis added). More specifically with regard to standing, section 3(b), which defines who is an "interested party," expressly limits challenges to those "with respect to an activity referred to in subsection [2](a)." *Id.* § 3(b), 112 Stat. at 2383.

■ If Congress intended to provide "interested party" standing to challenge cost comparisons pursuant to a public-private competition under section 2(e), Congress would not have expressly limited such standing to challenges to the list. *Id.* § 2(e), 112 Stat. 2383. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 22, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir.1972)); *LeFevre v. Secretary, Dep't of Veterans Affairs*, 66 F.3d 1191, 1200 (Fed. Cir.1995) (citing *Russello*, 464 U.S. at 22, 104 S.Ct. 296). Accordingly, under the plain language, Congress did not intend for federal employees and their unions to be able to challenge cost comparisons.[23]

Moreover, no evidence exists in the legislative history of the FAIR Act that would dictate a contrary result. Congress recognized that even when an activity is listed as appropriate to be contracted out, federal employees might be able to perform that activity more economically than private contractors. Thus, FAIR allows for a public-private competition under section 2(e). *See* FAIR § 2(e), 112 Stat. at 2383. However, according to the legislative history, if the agency conducts a public-private competition, the

22. The district court recognized standing to challenge the initial decision to contract out an activity in *National Air Traffic Controllers Assoc.*, 944 F.Supp. at 1345, in which the court held that plaintiffs had standing to challenge the agency's initial decision to privatize certain functions allegedly in violation certain prohibitions of federal procurement statutes and OMB Circular A–76.

23. This court recognizes that employees and their unions are included under OMB Circular A–76 as "interested parties," who can administratively challenge the cost comparison decision administratively and that Congress was fully

aware of the rights provided for under OMB Circular A–76 when enacting FAIR. *See* 144 Cong. Rec. at S9104 (statement of Sen. Thomas). This is all the more reason why this court finds that Congress' failure to include the cost comparison provision, section 2(e), within the ambit of section 3 challenges was not a mere oversight. Congress was aware of the well-settled rule that Executive Orders do not by themselves establish rights to judicial review. *See Independent Meat Packers Assoc. v. Butz*, 526 F.2d 228, 236 (8th Cir.1975).

purpose of that competition is to provide the "best value to the American taxpayer;" the purpose is not to support continued employment by federal workers. *See* 144 Cong. Rec. at S9104, quoted *supra* p. 597.

Plaintiffs argue that in vindicating their interests, *i.e.*, preventing the government from contracting out their jobs in violation of federal procurement statutes, they are furthering Congress' interest in providing the most economical result for taxpayers. In this connection, plaintiffs stress that they are the only parties in a position to enforce compliance with the cost comparison provision where the decision is to contract out the work.

Other displaced federal employees and their unions have asserted these same arguments in the past to support their right to challenge cost comparisons performed under the identical language in 10 U.S.C. § 2462(b). And, as the government correctly notes, the courts have uniformly rejected these arguments. Most recently, the Seventh Circuit in *AFGE v. Cohen*, 171 F.3d at 470–71, held that displaced federal workers and their unions lack standing to challenge the government's compliance with 10 U.S.C. § 2462(b). In applying the zone-of-interest test in connection with 10 U.S.C. § 2462(b), the Seventh Circuit found that federal workers' interests were "indistinguishable from that of any taxpayer, which is insufficient to support standing under the zone-of-interest test." *Id.* at 470–71 (citing *NFFE v. Cheney*, 883 F.2d at 1047). Relying on longstanding Supreme Court precedent, that persons with only a " 'generalized grievance' about the way in which government operates do not have standing," the Circuit concluded that "without something more, the federal employees in this case do not pass the test." *Id.* at 471.

The Seventh Circuit further explained that displaced federal workers cannot show something more based on their interest in keeping their jobs. As the Seventh Circuit stated, "the interests of federal employment, and the goal of private procurement are inconsistent." [24] *Id.* (citing *NFFE v. Cheney*, 883 F.2d at 1051); *see also National Credit Union*, 522 U.S. at 491, 118 S.Ct. 927 (stating that the zone-of-interests test "denies a right of review if the plaintiff's interests are ... marginally related to or inconsistent with the purposes implicit in the statute") (citations omitted) (alteration in original).

■ Plaintiffs in this case stand in no better position than the plaintiffs in *AFGE v. Cohen*. They have not provided this court with any basis upon which to deviate from the precedent followed in that case. [25] Although AFGE was decided under 10 U.S.C. § 2462, the legislative history indicates that, Congress had the same purposes in mind in enacting FAIR that are evident in 10 U.S.C. § 2462(b). Indeed, as noted above, the cost comparison language reviewed in *AFGE v. Cohen* is identical to the language of section 2(e) of the FAIR Act. *See supra* p. 589 n. 6. Where "Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, as

---

**24.** The Seventh Circuit, however, eventually did find plaintiffs were within the zone of interests of the Arsenal Act, 10 U.S.C. § 4532 (1994), which "[u]nlike the other statutes cited by the plaintiffs ... appears to be aimed at preserving the government's in-house military production capabilities." *AFGE v. Cohen*, 171 F.3d at 473.

**25.** Moreover, several courts have expressly determined that displaced federal workers and unions do not have standing to challenge a procurement decision to outsource work on the grounds that plaintiffs claim is their chief concern here. Plaintiffs claim that the "largest single error" in the cost comparison is that EG & G won the competition by violating the SCA, 41 U.S.C. §§ 351–354, and its implementing regulations, 48 C.F.R. § 52.222–41, in identifying job classifi-

cations. Although plaintiffs do not rely on the SCA as a basis for standing, they argue that labor classifications that violate the act undermine the "fair and realistic" requirement of the cost comparison provision of FAIR, thereby affecting their interest in not being deprived of federal employment as a result of an unlawful procurement process. This same argument has been rejected on standing grounds. In *American Fed'n of Gov't Employees v. Stetson*, 640 F.2d 642, 646 (5th Cir.1981), and *American Fed'n of Gov't Employees v. Dunn*, 561 F.2d 1310, 1313 (9th Cir. 1977), the courts of appeal held that the SCA was only intended to protect the rights of the employees of private contractors hired to perform government services, not displaced federal employees.

least insofar as it affects the new statute." *Lorillard v. Pons*, 434 U.S. 575, 580–81, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978).

█ Although the Seventh Circuit decided *AFGE v. Cohen* after FAIR was enacted, the Circuit based its rationale in that case on a long line of precedent first articulated by the Circuit Court of Appeals for the District of Columbia in *NFFE v. Cheney*, 883 F.2d at 1038. In *NFFE v. Cheney*, the D.C. Circuit determined that federal unions and their members were not within the zone of interests protected by 10 U.S.C. § 2462(b) (then "section 1223(b)"),[26] which contained the same cost comparison requirement. *See id.*[27]

Significantly, Congress enacted FAIR after the decision in *NFFE v. Cheney* and therefore can be presumed to have had knowledge of the interpretation given the cost comparison language in the provision. Congress had the opportunity to add protections for federal employment at that time, if it intended to do so. In fact, according to the legislative history, federal employee unions, including AFGE, actively participated in for-

mulation of the FAIR Act. *See* 144 Cong. Rec. at S9104, quoted *supra* p. 597.

Examined against this backdrop, this court is persuaded that Congress did not intend to include federal employees and their unions within the zone of interests protected by section 2(e) of FAIR or 10 U.S.C. § 2462(b).[28] As such, these plaintiffs cannot establish standing under the APA and therefore are not "interested parties" able to maintain this action under the ADRA.

## CONCLUSION

Based on the forgoing, this court **GRANTS** defendant's motion to dismiss. In addition, this court **DENIES** plaintiffs' motion for preliminary injunction and cross motion for judgment on the administrative record. The clerk is directed to enter judgment accordingly. The parties shall bear their own costs.

26. Section 1223(b), the cost comparison provision at issue in *NFFE v. Cheney*, was first enacted as Pub.L. No. 99–661, § 1223(b), 100 Stat. 3816, 3977 (originally codified at 10 U.S.C. § 2304 note (Supp. III 1985)), but later repealed and recodified in 10 U.S.C. § 2462(b), when Congress enacted Pub.L. No. 100–370, § 2(a)(1), (c)(3), 102 Stat. 840, 853–54 (1988) in order to codify several defense authorization statutes, which were permanent provisions of law but were enacted as free-standing provisions rather than as amendments to the United States Code or other appropriate existing laws. *See* H.R. Rep. No. 100–696, *reprinted in*, 1988 U.S.C.A.A.N. 1077.

27. The plaintiffs correctly note that the portion of the *NFFE* decision which states that the zone-of-interests test requires claimants to show that they are intended beneficiaries of the statute is no longer good law. The Supreme Court has expressly disavowed that reasoning. *See National Credit Union*, 522 U.S. at 488–89, 118 S.Ct. 927 (holding that "we should not inquire whether there has been a congressional intent to benefit the would-be plaintiff").

However, the Supreme Court has adopted *NFFE's* reasoning with regard to the zone of

interests to be protected under federal statutes aimed at allowing for private competition. For example, in *Air Courier Conference v. American Postal Workers*, 498 U.S. 517, 528 n. 5, 111 S.Ct. 913, 112 L.Ed.2d 1125 (1991), the Supreme Court expressly stated "[t]he PES are competition statutes that regulate the conduct of competitors of the Postal Service.... Employees have generally been denied standing to enforce competition laws because they lack competitive and direct injury."

28. This court recognizes that in so ruling it is possible that no party will have standing to challenge the DLA's cost comparison. This is not, however, a basis upon which to find standing. *See AFGE v. Cohen*, 171 F.3d at 471 n. 12 (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974)) ("The assumption that if respondents have no standing to sue, no one would have standing is not a reason to find standing ... our system of government leaves many crucial decisions to the political process.") (alteration in original).