**CYBERTECH GROUP, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant,**

**and**

**Intellidyne, L.L.C., Intervenor-defendant.**

No. 00–768 C.

United States Court of Federal Claims.

Filed Feb. 14, 2001.

Opinion was originally filed under seal on Jan. 26, 2001 [1].

---

**1.** This opinion was issued under seal on January 26, 2001. Pursuant to ¶ 3 of the ordering language, the parties were requested to identify protected/privileged material subject to deletion. No deletions were requested.

Richard D. Lieberman, Washington, D.C., for the Plaintiff. Karen R. O'Brien, Washington, D.C., of counsel.

Kyle Chadwick, Washington, D.C., with whom was David M. Ogden, Assistant Attorney General, United States Department of Justice, for the Defendant. Robert E. Lieblich and Cynthia Grey Effer, Associate Counsel, Eugene Kim and Valencia Bowers, Assistant Counsel, Naval Sea Systems Command, Arlington, VA, of counsel.

## OPINION

BUSH, Judge.

In this post-award bid protest action, brought pursuant to 28 U.S.C. § 1491(b),

plaintiff, Cybertech Group, Inc., (CGI or Cybertech) seeks: (1) a declaration that Naval Sea Logistics Center Contracting Department (SEALOG), at the Naval Supply Activity in Mechanicsburg, Pennsylvania (PA) award of a delivery order to intervenor-defendant, Intellidyne, L.L.C., (Intellidyne) was improper, and violative of the Federal Acquisition Regulations (FAR) and applicable precedents; (2) an order requiring SEALOG to perform a new competition that permits CGI to compete for the information technology (IT) services; and (3) for CGI to be awarded its reasonable costs, attorneys' fees, and proposal costs. For the reasons set forth below, plaintiff's request for declaratory and injunctive relief is denied.

## BACKGROUND

### I. Facts

#### A. CGI's performance of IT services for the Office of the Assistant Secretary of Defense for Health Affairs

The plaintiff, CGI, is a Maryland corporation which is engaged in the business of providing information technology services nationwide. Mr. Roger Sigley is President and Chief Executive Officer of CGI. The Office of the Assistant Secretary of Defense for Health Affairs (OASD(HA)) is the technical manager for health care information systems and networks. In November 1998, CGI began providing information technology services to OASD(HA), including the TRICARE Management Activity (TMA) thereof. Between November 1998 and February 2000, CGI provided these IT services to OASD(HA) as a subcontractor to Aurora Enterprise Solutions (Aurora). The government placed delivery orders to Aurora under a Federal Supply Service (FSS) Schedule 70 Multiple Award Schedule (MAS) contract. The successor-contractor to Aurora, Ubizen Co., no longer held an MAS Schedule 70 contract in February 2000. The government then awarded the delivery order for the IT services to CGI.

In the year 2000, the Operations and Advanced Technology Integration Center (OAT-

IC) in the TRICARE Management Activity, acting through its contracting officer (CO) at the United States General Services Administration (GSA), Rocky Mountain Region, awarded IT delivery services to TMA pursuant to Contract No. GS–35F–0047K, an FSS MAS contract. These delivery orders included Nos. OR00284GSA, OR00663GSA1 and 01RT0233. Delivery orders to CGI were issued for periods of between two and four months of performance for each delivery order. At the time this protest was filed, CGI was performing delivery orders for OASD(HA) at a rate of approximately $8 million annually. The last of these delivery orders, 01RT0233, is for IT services to be performed by CGI for the TMA from November 6, 2000 through January 15, 2001.

#### B. CGI's allegations of impropriety

Lt. Col. Fred Peters, the Director of OAT-IC in the TMA, retired from active military duty in February 2000. Immediately following his retirement, he returned to OATIC, TMA as a consultant employed by Axiom, a private company. In February 2000, an interim director of OATIC was appointed, and on June 2, 2000, Gary Thomas was appointed Director of OATIC. CGI and Fred Peters subsequently engaged in negotiations concerning Peters' potential employment with CGI.

Of particular importance in this case is CGI's allegation that in a September 27, 2000 meeting held in Mr. Gary Thomas' office, Mr. Thomas told Mr. Sigley that if CGI did not hire Peters "then OASD(HA) might be unwilling to issue any future delivery orders to CGI for TMA IT services." Compl. ¶ 17.[2] CGI further alleges that around October 2000, Mr. Peters made demands that CGI grant him forty percent of CGI stock, and appoint him to serve as CGI's President and Chief Operating Officer. According to CGI, Mr. Sigley did not find these proposed terms acceptable. Therefore, Mr. Sigley states he ceased negotiations with Mr. Peters concerning Peters' potential employment at CGI. CGI alleges that without notifying the GSA

---

**2.** All citations to the complaint in this opinion refer to the Second Amended Complaint for In-

junctive and Declaratory Relief filed January 9, 2001.

contracting officer then administering CGI's contract, OASD(HA), on some date prior to November 22, 2000, requested that SEA-LOG, at the Naval Supply Activity in Mechanicsburg, PA, procure the same services for the TMA as CGI was then providing through the Schedule 70 MAS contract. CGI alleges that OASD(HA) specified, in conjunction with this request, that the services were not to be obtained from CGI and that CGI was not to be solicited.

## C. The solicitation and award of a delivery order for IT services at OASD(HA)

At the time that CGI was the incumbent contractor, the delivery order was solicited and administered by GSA. Although CGI has attempted to characterize OASD(HA)'s switch from GSA to the Navy as part of a conspiracy to harm plaintiff, the delivery order at issue in this case was solicited and administered by SEALOG rather than GSA because SEALOG generally charges only 1% of the contract amount for its services, whereas GSA charges 3–4%. Mr. Francis Duggan was the contracting officer who solicited and administered the delivery order. Attached as Exhibit 1 to the Request for Quotation (RFQ) is a Statement of Work. CGI was not advised that a solicitation had been issued to schedule contractors for the IT services CGI was providing TMA. On November 22, 2000, SEALOG issued RFQ No. N6553801Q0027 to four contractors: Intellidyne; Celtic Technologies, Inc.; BNF Technologies, Inc.; and KBM Technologies, for TMA IT services under MAS Schedule 70.

Pursuant to the RFQ, offerors were required to submit their quotes by December 1, 2000. Intellidyne submitted its quote totaling $8,012,835.20 on December 1, 2000. It was the only recipient of the RFQ to submit a quote.

On December 1, 2000, Mr. Francis Duggan sent an e-mail to Gary Thomas containing the following request:

> Please review the quote received, in accordance with the "Best Value" criteria pro-

vided by "Exhibit B" of the RFQ. If you find that the quote is adequate and reasonable please advise me. As there was only one quote received there is no need to "score" the evaluation. A simple email advising of your acceptance of the quote will suffice.

AR at 86.[3]

Mr. Thomas replied to this message via e-mail on December 4, 2000. He stated that he found the Intellidyne quote to be "acceptable and reasonable." AR at 87. In the small purchase pricing memorandum dated December 21, 2000, Frank Duggan explained the price reasonableness determination as follows:

> The unit prices contained in this order were negotiated under the terms of a GSA schedule. In accordance with FAR 8.404(a), the prices of a GSA Schedule are determined to be fair and reasonable at the time of GSA contract award. The requirements of FAR 8.404(b)(2) have been met by requesting quotes from other schedule holders. The technical representative has reviewed and evaluated the quotes received and determined that the quote from the contractor provides best value. The contractor discounted their GSA rates by 0 to 33%. Based upon this analysis, I hereby determine that the total time and materials quote from the contractor is fair and reasonable.

AR at 100.

The Intellidyne delivery order, number N65538–01–F–0082 was for $8,012,835.20 and the period of performance was to run from December 15, 2000 to September 30, 2001. AR 114, 115. On December 14, 2000, Col. Garry Stanberry, Deputy Director for Information Technology Management and Reengineering in OASD(HA) telephoned Mr. Roger Sigley and informed him that CGI's services would no longer be required by OASD(HA) after the period for CGI's current delivery order was completed on January 16, 2001.

## D. CGI's further allegations of impropriety

CGI avers that Intellidyne is a company with fewer than ten employees and, accord-

---

**3.** "AR ___" refers to pages of the administrative record.

ingly, it will be unable to provide the services under its delivery order unless it hires qualified personnel. CGI alleges that on December 15, 2000, Mr. Skip Bruhn, Deputy Director of OATIC in Aurora, Colorado, met with eight CGI employees and requested that they leave CGI, join Intellidyne and continue to support TMA/OATIC. It also alleges that on that same date, Mr. Fred Peters contacted three contract representatives within OASD(HA) with whom CGI has business, and urged them to terminate those contracts because CGI "is no longer a viable company." Compl. ¶ 46. CGI also states that it has received other reports of Mr. Fred Peters contacting CGI employees and encouraging them go to work for Intellidyne.

CGI further contends that during the months of October, November and December 2000, Mr. Gary Thomas of OASD(HA), acting in concert with Mr. Fred Peters, caused to be awarded to Intellidyne three delivery orders (in addition to the one at issue in this case).

CGI contends that Mr. Gary Thomas of OASD(HA), who previously had provided technical coordination with Mr. Roger Sigley, has refused to meet with Mr. Roger Sigley to discuss performance of CGI's delivery orders since late September 2000. Plaintiff also alleges that the government issued performance ratings reflecting a score "5" out of a possible "5" on CGI's year 2000 bimonthly invoices, with the exception of three invoices that were rated "3" without an explanation. On December 12, 2000, CGI submitted two claims to the GSA contracting officer wherein it challenged the performance ratings of "3." On December 15, 2000, the GSA contracting officer, Mr. Wilton Webb, orally advised CGI that he would require OASD(HA) to change the performance ratings of "3" and insert "5" in lieu thereof, because OASD(HA) had not justified the "3" ratings.

## II. Procedural history

On December 20, 2000, Cybertech filed its complaint for preliminary and permanent injunctions and declaratory judgment. In its second amended complaint, Cybertech seeks relief on seven counts: (1) Failure to Permit Incumbent to Compete—FAR; (2) Failure to Permit Incumbent to Compete—General; (3) Improper "Steering" of Contract Award; (4) Government Bias and Improper Coordination with Other Contractors; (5) Unlawful Sole Source Competition; (6) Failure to Conduct a Best Value Analysis; and (7) Failure to Make Award to Lowest Overall Cost Alternative. The court granted Intellidyne's verbal request to be permitted to enter an appearance as intervenor-defendant in the present dispute in a December 27, 2000 order.

In its complaint, Cybertech sought a preliminary injunction prohibiting SEALOG from allowing performance to begin under Delivery Order No. N65538-01-F-0082 which had been awarded to Intellidyne on December 8, 2000. During a December 21, 2000 teleconference, the parties consented to the entry of a temporary restraining order (TRO) to cover the period from December 26, 2000, until the date the court rendered this decision. Accordingly, on December 27, 2000, this court ordered the issuance of such a TRO. CGI filed a bond in the amount of $50,000 on January 4, 2001. Also, on January 2, 2001, the court issued an agreed upon protective order.

The government filed the administrative record on December 27, 2000. Subsequently, plaintiff filed: (1) Plaintiff's motion requesting permission to take depositions filed January 2, 2001; (2) Plaintiff's motion to compel production of documents missing from administrative record filed January 2, 2001; (3) Plaintiff's motion for leave to supplement administrative record filed January 3, 2001; (4) Plaintiff's motion requesting the compelled production of all communications during 2000 pertaining to the protested procurement or, alternatively, ordering plaintiff to examine relevant e-mails during 2000 filed January 2, 2001; and (5) Plaintiff's motion for leave to file amended complaint filed January 2, 2001, within which plaintiff sought permission to file its first amended complaint for injunctive and declaratory relief, and plaintiff's protected supplement to first amended complaint for injunctive and declaratory relief. In turn, the defendant filed: (1) Defendant's brief in opposition to plaintiff's motion for leave to take seven depositions filed January 3, 2001; (2) Defendant's re-

sponse to plaintiff's motion for leave to amend complaint filed January 8, 2001; and (3) Defendant's stipulation in response to plaintiff's motion to supplement the administrative record filed January 8, 2001.

Intervenor-defendant Intellidyne filed, on January 2, 2001, an opposition to plaintiff's motion requesting depositions and plaintiff's motion requesting production of additional documents. Based upon the court's January 8, 2001 order, plaintiff was permitted to depose the following five individuals:

(1) Mr. Frank Duggan, CO, U.S. Navy;

(2) Mr. Gary Thomas, Director of OASD(HA), Operations and Advanced Technology Integration Center;

(3) Mr. Fred Peters (Lt.Col, USAF, Retired), a contractor employee and consultant;

(4) Col. Garry Stanberry, Deputy Director of Information Technology Management and Reengineering, OASD(HA); and

(5) Mr. Keith Simmons, Inspecting and Approving Official, OASD(HA).

The court also granted intervenor-defendant Intellidyne's request to depose Mr. Roger Sigley.

On December 27, 2000, the government filed its motion to dismiss counts I and II of the complaint. The government filed its prehearing brief in opposition to plaintiff's motion for permanent injunction on January 3, 2001. The plaintiff filed its opposition to defendant's motion to dismiss counts I and II, and plaintiff's pre-trial brief in support of its request for preliminary and permanent injunctions on January 12, 2001. Intervenor-defendant filed its pretrial brief and motion to dismiss on January 12, 2001. On January 16, 2001, this court held oral argument on the foregoing motion and a hearing on counts III–VII. The parties submitted limited post-trial briefs on January 19, 2001.

## DISCUSSION

### I. COFC Jurisdiction

#### A. 28 U.S.C. § 1491(b)(1)

The Administrative Dispute Resolution Act of 1996, Pub.L. No. 104–320 § 12, 110 Stat. 3870, 3874–75 (1996) (ADRA), amended the Tucker Act, 28 U.S.C. § 1491 to provide the court with

jurisdiction to render judgment on an action by an interested party objecting to the solicitation by a Federal Agency for bids or proposals for a proposed contract . . . or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

28 U.S.C. § 1491(b)(1).

### B. Whether CGI is an interested party

#### 1. Applicable test for ascertaining "interested party" status

A party only has standing to sue under section 1491(b)(1) when it is an "interested party." 28 U.S.C. § 1491(b)(1); *Cincom Sys., Inc. v. United States*, 37 Fed.Cl. 663, 669 (1997). The Tucker Act does not, however, define the term "interested party." Accordingly, this court has often looked to the General Accounting Office (GAO) jurisdictional statutes' definition of "interested party" for guidance as to the meaning of this term. *See Myers Investigative and Sec. Servs., Inc. v. United States*, 47 Fed.Cl. 605, 612 (2000) (citing *Cincom Sys.*, 37 Fed.Cl. at 669). The Competition in Contracting Act (CICA), Pub.L. No. 98–369, 98 Stat. 1175 (codified as amended in scattered sections of 10, 31, and 41 U.S.C.), which governs administrative bid protests before the GAO defines an interested party as: "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." 31 U.S.C. § 3551(2). This court treats this definition as advisory rather than binding because the court has found there is some divergence between the potential standing under the Tucker Act and that provided for in section 3551(2). *See CCL, Inc. v. United States*, 39 Fed.Cl. 780, 789 (1997). As the Federal Circuit recently stat-

ed: "[i]t is unclear whether section 1491(b)(1) adopts the liberal APA standing requirement set forth in section 702 of the APA or whether it adopts the more restrictive standard set forth in 31 U.S.C. § 3551(2) for GAO review of bid protests."[4] *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333–34 (Fed.Cir.2001).

■ In *American Fed'n of Gov't Employees, AFL–CIO v. United States (AFGE )*, 46 Fed.Cl. 586 (2000), Judge Firestone examined the issue of which standard section 1491(b)(1) adopts. Following an extensive analysis of this issue, she concluded that "in accordance with the words of the ADRA and its legislative history, this court concludes that the COFC may also hear challenges to procurement award decisions brought by persons who would have had standing in federal district court under the APA to challenge that same procurement decision." *Id.* at 595. This court agrees with that conclusion for the reasons detailed in *AFGE*, 46 Fed.Cl. at 592–95.

■ Accordingly, for CGI to establish that it is an "interested party" under 28 U.S.C. § 1491(b)(1), it must demonstrate that:

(1) it suffered sufficient "injury-in-fact"

(2) that the injury is "fairly traceable" to the agency's decision and is "likely to be redressed by a favorable decision;" and

(3) that the interests sought to be protected are "arguably within the zone of interests to be protected or regulated by the statute . . . in question."

*AFGE*, 46 Fed.Cl. at 595 (quoting *National Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 488, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998)). *See also CHE Consulting, Inc. v. United States*, 47 Fed.Cl. 331 (2000) (applying the APA standard to determine "interested party" status under 28 U.S.C. § 1491(b)).

**2. CGI's status as an "interested party" for purposes of Counts I–V**

■ It is the decision of this court that CGI is an interested party for purposes of bringing counts I through V of its complaint.

In these counts, CGI challenges the government's decision not to send it a request for quotations. The first requirement for establishing standing under the APA is that plaintiff must have suffered sufficient "injury in fact." *AFGE*, 46 Fed.Cl. at 595. The loss of future profits, an economic injury, constitutes an injury under the APA test. *CHE*, 47 Fed.Cl. at 338–39 (citing *Data Processing Serv. v. Camp*, 397 U.S. 150, 154, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)). In this case, CGI previously performed the same type of work that is the subject of the Intellidyne delivery order. CGI has lost a potential source of revenue as a result of the award of delivery order number N65538–01–F–0082 to Intellidyne. CGI did not have an opportunity to submit a quotation for services it wishes to perform and therefore had no chance of selection with regard to award of that delivery order. Accordingly, this court is satisfied that CGI at least minimally meets the "injury in fact" prong of the APA test.

The second standing requirement under the APA requires plaintiff to show that the injury is "fairly traceable" to the agency's decision and is "likely to be redressed by a favorable decision." *AFGE*, 46 Fed.Cl. at 595. In this case, the injury, i.e., a lack of solicitation to present a quote, is fairly traceable to the agency's decision not to solicit CGI. If SEALOG had sent an RFQ to CGI it would have had the opportunity to submit a quotation and possibly would have been awarded the delivery order. Thus, CGI's injury is likely to be redressed by a favorable decision.

Under the third standing requirement under the APA, the plaintiff must establish that "the injury [it] complains of . . . falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *CHE*, 47 Fed.Cl. at 339 (quoting *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 883, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)). Although there is not a specific statutory or regulatory provision upon which plaintiff may reasonably rely with respect to counts I–V, it is well established that the government must

---

4. APA stands for Administrative Procedure Act.

not conduct its procurement activities in bad faith. CGI has a cognizable interest in ensuring that it was not denied the opportunity to submit a quotation because of egregious governmental impropriety. Accordingly, CGI meets the third prong of the APA standard for counts I–V of its complaint.

### 3. CGI's status as an "interested party" for purposes of Counts VI–VII

█ In counts VI and VII, respectively, CGI alleges that the government erroneously failed to perform a best value analysis and failed to award to the lowest cost alternative. As discussed *supra* in conjunction with whether CGI is an "interested party" for purposes of counts I–V, CGI has shown that it has suffered an "injury in fact" and, therefore, that it meets the first requirement for standing under the APA.

The second standing requirement under the APA requires plaintiff to show that the injury is "fairly traceable" to the agency's decision and is "likely to be redressed by a favorable decision." *AFGE*, 46 Fed.Cl. at 595. In the instant case, the injury is not fairly traceable to the government's evaluation of Intellidyne's price or value. Moreover, the injury is not likely to be redressed by a favorable decision in this matter. This is so because, as the court concludes with respect to counts I and II, CGI had no right whatsoever to receive an RFQ in the first instance. Accordingly, even if the court found error in the agency's application of the special ordering procedures, CGI is not an interested party in terms of complaining about how the government proceeded with the procurement. CGI is, in fact, in no better position to challenge the government's alleged failure to perform a best value analysis and failure to award the lowest cost alternative than any of the approximately 1800 other contractors that offer services under Special Item Number (SIN) 132–51 of their GSA FSS 70 contracts. Ergo, CGI does not meet the second prong of the APA standard as to counts VI and VII.

Under the third standing requirement under the APA, the plaintiff must establish that "the injury [it] complains of … falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *CHE*, 47 Fed.Cl. at 339 (quoting *Lujan*, 497 U.S. at 883, 110 S.Ct. 3177). CGI certainly fails to meet this standing requirement as to counts VI and VII. In these counts, CGI alleges violations of FAR 8.404. Yet FAR 8.402 provides:

> Procedures in this subpart apply to Federal Supply Schedule contracts. Occasionally, special ordering procedures may be established. In such cases the procedures will be outlined in the "Federal Supply Schedules."

Pursuant to this FAR provision, the procedures applicable to this delivery order are those contained in the GSA FSS Schedule 70 contract under the terms and conditions applicable to Special Item Number (SIN) 132–51 for IT services. On its face, the GSA Special Ordering Procedures are enacted primarily for the benefit of the government, and are perhaps, to a certain extent, enacted for the benefit of those contractors who receive RFQs for delivery orders placed under the FSS. There is nothing whatsoever in the special ordering procedures to suggest that they are enacted for the benefit of contractors who were not solicited to submit a quote for the delivery order, and the special ordering procedures are certainly not enacted for the benefit of incumbent contractors. In fact, a recent GAO report expressed concern that agencies "generally ended up placing [ ] orders with incumbent contractors … [and did] not follow[ ] the Federal Supply Schedule requirement for competitive quotes." CONTRACT MANAGEMENT: NOT FOLLOWING PROCEDURES UNDERMINES BEST PRICING UNDER GSA'S SCHEDULE (GAO–01–125, 11/28/00) at 4. In light of the foregoing, CGI does not meet the requirement of the third prong of the APA standard.

For the above-stated reasons, CGI is not an interested party for purposes of counts VI and VII.

### II. Standard of Review

█ Under the standard of review applicable in bid protests, an agency's procurement decisions will be upheld unless shown to be

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); 28 U.S.C. § 1491(b)(4). Although the agency's decision is entitled to a "presumption of regularity," the court will conduct a "thorough, probing, indepth review" of the agency's decision. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). In conducting this inquiry, the court will look to see whether the agency has " 'examin[ed] the relevant data and articulat[ed] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.' " *Rainbow Navigation, Inc. v. Dep't of Navy,* 783 F.2d 1072, 1080 (D.C.Cir.1986) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

■ In undertaking this analysis, the court is not to substitute its judgment for that of the agency, even if reasonable minds could reach differing conclusions. *CRC Marine Servs., Inc. v. United States,* 41 Fed.Cl. 66, 83 (1998). The court recognizes that the agency possesses wide discretion in the application of procurement regulations. *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1332–33 (Fed. Cir.2001). *See also Federal Power Comm'n v. Florida Power & Light Co.,* 404 U.S. 453, 463, 92 S.Ct. 637, 30 L.Ed.2d 600 (1972); *Bellevue Bus Serv., Inc. v. United States,* 15 Cl.Ct. 131, 133 (1988). The court must, however, perform a thorough review of even technical decisions in order to meaningfully exercise its jurisdiction. *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed. Cir.1988).

In reviewing an agency's procurement actions, the court applies the standards set forth in the APA, 5 U.S.C. §§ 551–559, 701–706. Under 5 U.S.C. § 706(2), the reviewing court must determine whether the agency's actions were: (A) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

[or] (D) without observance of procedure required by law.

■ In determining whether an agency's actions were arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law, the court must ascertain whether: (1) there was subjective bad faith on the part of the procurement officials; (2) there was a reasonable basis for the procurement decision; (3) the procurement officials abused their discretion; and (4) pertinent statutes or regulations were violated. *Keco Indus., Inc. v. United States,* 203 Ct.Cl. 566, 492 F.2d 1200, 1203–04 (1974).

Furthermore, "to prevail in a protest the protestor must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed. Cir.1996).

### III. Motion to Dismiss for Failure to State a Claim—RCFC 12(b)(4)

■ The government argues that this court should dismiss counts I–II of CGI's claim because, pursuant to RCFC 12(b)(4), CGI has failed to state a claim upon which relief can be granted. RCFC 12(b)(4) is identical to Rule 12(b)(6) of the Federal Rules of Civil Procedure, which provides that a claim will be dismissed when it fails "to state a claim upon which relief can be granted." RCFC 12(b)(4); Fed.R.Civ.P. 12(b)(6). These rules "allow the dismissal of actions that are 'fatally flawed in their legal premises and destined to fail, * * * spar[ing] litigants the burdens of unnecessary pretrial and trial activity.' " *Maniere v. United States,* 31 Fed.Cl. 410, 419 (1994) (quoting *Advanced Cardiovascular Sys. Inc. v. SciMed Life Sys., Inc.,* 988 F.2d 1157, 1160 (Fed.Cir. 1993)). In order to withstand a 12(b)(4) motion to dismiss, the plaintiff must allege facts that would, if they were ultimately established, permit relief as a matter of law. *Maniere,* 31 Fed.Cl. at 421 (citing *Howard v. United States,* 21 Cl.Ct. 475, 477 (1990)). *See also Conley v. Gibson,* 355 U.S. 41, 45, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). In ruling on a motion to dismiss, this court must construe all allegations in the light most favorable to the non-moving party. *Scheuer v.*

*Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). A ruling under RCFC 12(b)(4) is an adjudication on the merits. *L.E. Cooke Corp. v. United States,* 27 Fed.Cl. 753, 755 (1993).

### A. Count I (Failure to Permit Incumbent to Compete—FAR); Count II (Failure to Permit Incumbent to Compete—General)

In count I, Failure to Permit Incumbent to Compete, plaintiff alleges that the contracting officer at SEALOG violated FAR 14.205–4(b) through (1) its failure to advise CGI, the incumbent contractor, that a competition was taking place, (2) its failure to provide CGI with an RFQ, and (3) failure to obtain an offer from CGI. Plaintiff alleges these acts were not rational or reasonable. The court notes that based on plaintiff's opposition to defendant's motion to dismiss counts I and II, it appears that plaintiff has abandoned this argument as it never cites to FAR 14.205–4(b) in its brief.

The major difficulty with plaintiff's position is that FAR 14.205–4(b) is completely inapplicable to FSS schedule purchases. As discussed in the background section, *supra,* the present dispute involves a delivery order placed under an FSS schedule. FAR 14.000 makes clear that part 14 prescribes:

(a) The basic requirements of contracting for supplies and services (including construction) by sealed bidding,

(b) The information to be included in the solicitation (invitation for bids),

(c) Procedures concerning the submission of bids,

(d) Requirements for opening and evaluating bids and awarding contracts, and

(e) Procedures for two-step sealed bidding.

Clearly, the procedures set forth in this part of the FAR have no applicability whatsoever to the placement of a delivery order from an FSS schedule. The requirements for these two types of contracts are entirely distinct from one another. In sealed bidding, the government sets forth its needs with precision, holds an open competition to obtain the best price, opens the bids publicly,

and awards to the responsible bidder that submits the lowest price and agrees to meet all the material contract requirements. JOHN CIBINIC AND RALPH C. NASH JR., FORMATION OF GOVERNMENT CONTRACTS, 506 (GWU, 3d ed. 1998). By contrast, the streamlined FSS program is authorized by FAR Parts 8.4 and 38. The GSA schedule system

provides Federal agencies with a simplified process for obtaining commonly used supplies and services at prices associated with volume buying [ ]. Indefinite delivery contracts (including requirements contracts) are established with commercial firms to provide supplies and services at stated prices for given periods of time... The GSA schedule contracting office issues publications, titled Federal Supply Schedules, containing the information necessary for placing delivery orders with schedule contractors. Ordering offices [then] issue orders directly to the schedule contractors for the required supplies or services.

FAR 8.401(a)-(b).

Because GSA has awarded the contractors indefinite delivery contracts or "schedules" using competitive procedures, agencies are not required to obtain competition and determine reasonable prices, except as GSA's special ordering procedures may require. FAR 8.402. *See also* discussion *infra* regarding special ordering procedures. Accordingly, any order placed against a GSA supply schedule is "considered to be issued pursuant to full and open competition[ ]." FAR 8.404. *See also* 10 U.S.C. § 2302(2)(C); 41 U.S.C. § 259(b)(3) (stating that the term "competitive procedures" includes the procedures established by GSA for the multiple award schedule program if (i) participation in the program has been open to all responsible sources; and (ii) orders and contracts under such program result in the lowest overall cost alternative to meet the needs of the United States).

Moreover, the plaintiff has been unable to cite, and this court has been unable to locate, any case applying the procedures of FAR 14.205–4 to FSS schedule purchases. The limited case law in the FSS contract arena supports the conclusion that FAR 14.205–4

does not bear on purchases from FSS schedules. For example, in *Ellsworth Assoc., Inc. v. United States,* 45 Fed.Cl. 388 (1999), the plaintiff, a losing offeror for a delivery order claimed that "[a]lthough the contract was originally envisioned as an FSS order ... [the agency] actually conducted it as a competitive negotiated procurement." *Id.* at 394. The plaintiff argued that "once an agency elects to use an approach which is more like a Part 15 negotiated procurement than a straight Part 8 FSS buy, it must adhere to the procedural requirements of Part 15." *Id.* The court flatly rejected this argument. It held that FSS procurements are not subject to the requirements of FAR Part 15 and that "Part 8 [of the FAR] governs agency acquisitions made pursuant to the FSS program." *Id.* at 393–94. *See also Computer Products, Inc.,* B–284702, May 24, 2000, 2000 CPD ¶ 95 at 3 (holding that the procedures of FAR Part 15, governing contracting by negotiation, do not apply to procurements under the FSS program).

Moreover, as intervenor-defendant correctly points out, the conclusion that FAR 14.205–4 has no applicability to the placement of a delivery order from an FSS schedule is buttressed by the fact that plaintiff has lifted the phrase upon which it relies in its complaint completely out of context. Plaintiff argues that FAR 14.205–4(b) requires that when invitations for offers are made by an agency, such as RFQs, that "bids shall be solicited from [ ] the previously successful bidder." Memorandum of Points and Authorities in Support of Plaintiff's Motion for Preliminary and Permanent Injunctions at 9. FAR 14.205–4 is captioned "Excessively long solicitation mailing lists" and subsection (b), from which the foregoing phrase is taken, is entitled "Rotation of lists." The phrase upon which CGI relies pertains to the fact that

under sealed bidding procedures mailing lists may be rotated and when this is done, the previously successful bidder must be solicited.[5] Clearly, FAR 14.205–4 is totally inapplicable to the instant case.

Count II of plaintiff's complaint is also legally unavailing. In this count, Failure to Permit Incumbent to Compete, plaintiff alleges that the contracting officer's actions were also violative of "applicable procurement precedents which generally require that a contracting officer solicit a current incumbent when seeking to award a contract for substantially similar work." Compl. ¶ 54. Despite this sweeping assertion, plaintiff has been unable to cite to any regulation, statutory provision, or applicable precedent requiring an incumbent to be solicited on delivery orders from an FSS schedule contract. *See* discussion *supra.* Moreover, this court has been unable to identify any regulation, statutory provision, or applicable case requiring an incumbent to be solicited on a delivery order from an FSS schedule contract.

As stated previously, FAR Part 8 sets forth the requirements which control the government's FSS program. Here, the government comported with the procedures set forth in FAR Part 8 in its placing of delivery order number N65538–01–F–0082. FAR 8.402 provides:

> Procedures in this subpart apply to Federal Supply Schedule contracts. Occasionally, special ordering procedures may be established. In such cases the procedures will be outlined in the "Federal Supply Schedules."

Pursuant to this FAR provision, the procedures applicable to this delivery order are those contained in the GSA FSS Schedule 70 contract under the terms and conditions applicable to Special Item Number 132–51 for

---

5. FAR 14.205–4(b) provides as follows:
    (b) Rotation of lists. By using different portions of a list for separate acquisitions, solicitation mailing lists may be rotated. However, considerable judgment must be exercised in determining whether the size of the acquisition justifies the rotation. The use of a presolicitation notice (see paragraph (c) below), time permitting, also should be considered. In rotating a list, the interests of small, small disadvantaged and women-owned small businesses (see 19.202–4) shall be considered. Whenever a list is rotated, bids shall be solicited from (1) the previously successful bidder, (2) prospective suppliers who have been added to the solicitation mailing list since the last solicitation, and (3) concerns on the segment of the list selected for use in a particular acquisition. However, the rule does not apply when such action would be precluded by use of a total set-aside (see part 19).

IT services. The special ordering procedures provide:

FAR 8.402 contemplates that GSA may occasionally find it necessary to establish special ordering procedures for individual Federal Supply Schedules or for some Special Item Numbers (SINs) within a Schedule. GSA has established special ordering procedures for services that require a Statement of Work. *These special ordering procedures take precedence over the procedures in FAR 8.404(b)(2) through (b)(3).*

GSA has determined that the prices for services contained in the contractor's price list applicable to this Schedule are fair and reasonable. However, the ordering office using this contract is responsible for considering the level of effort and mix of labor proposed to perform a specific task being ordered and for making a determination that the total firm-fixed price or ceiling price is fair and reasonable.

AR at 147–48 (emphasis added).

The special ordering procedures set forth three specific requirements:

(1) Prepare a Request (Request for Quote or other communication tool): ...

(2) Transmit the Request to Contractors: ...

(3) Evaluate Responses and Select the Contractor to Receive the Order: ...

AR at 148–50.

With respect to the requirements for transmitting the RFQ to contractor, the special ordering procedures provide:

(i) Based upon an initial evaluation of catalogs and price lists, the ordering office *should* identify the contractors that appear to offer the best value (*considering the scope of services offered, pricing and other factors such as contractors' locations, as appropriate*). When buying IT professional services under SIN 132–51 ONLY, the ordering office, at its discretion, may limit consideration to those schedule contractors that are small business concerns. This limitation is not applicable when buying supplies and/or services under other SINs as well as SIN 132–51. The limitation may only be used when at least three (3) small

businesses that appear to offer services that will meet the agency's needs are available, if the order is estimated to exceed the micro-purchase threshold.

(ii) The request *should* be provided to three (3) contractors if the proposed order is estimated to exceed the micro-purchase threshold, but not exceed the maximum order threshold. For proposed orders exceeding the maximum order threshold, the request should be provided to additional contractors that offer services that will meet the agency's needs. Ordering offices should strive to minimize the contractors' costs associated with responding to requests for quotes for specific orders. Requests should be tailored to the minimum level necessary for adequate evaluation and selection for order placement. Oral presentations should be considered, when possible.

AR at 149–50 (emphasis added).

In the instant case, the government did comply with the requirements for transmitting the RFQ to contractors. Here, the contracting officer sent the RFQ to four small businesses, which exceeded the number recommended in the special ordering procedures. However, even if the contracting officer had not solicited three contractors, the provision of the special ordering procedures setting forth the number of contractors to receive the RFQ is advisory—*not* mandatory. This conclusion is compelled by the fact that in everyday discourse, "shall" is used to denote an affirmative command or obligation whereas "should," by contrast, is used to denote a request or suggestion. Both the United States Supreme Court and the Federal Circuit have held that absent persuasive reasons to the contrary, words in a statute should be given their common meaning. *Pacificorp Capital, Inc. v. United States,* 852 F.2d 549, 551 (Fed.Cir.1988) (citing *Banks v. Chicago Grain Trimmers Ass'n,* 390 U.S. 459, 465, 88 S.Ct. 1140, 1144, 20 L.Ed.2d 30 (1968)). Although the foregoing special ordering procedures are not part of a statute, the same principles of construction apply.

Moreover, as the intervenor-defendant correctly points out, the FAR makes it clear that "[s]hall denotes the imperative." FAR

2.101. Both the Federal Circuit and this Court have held the word "should" denotes advisory or non-mandatory terms. For example, in *New England Tank Indus. of N.H. v. United States,* 861 F.2d 685, 694 (Fed.Cir. 1989), the Federal Circuit stated that "7420.1 ... contains no grant of discretion but, on the contrary, employs mandatory terms such as 'will not' and 'will' rather than directory terms such as 'should.'" This court also found in *Northrop Grumman Corp. v. United States,* 47 Fed.Cl. 20, 50 (2000) that "[t]he language of FAR § 35.006(c) is not mandatory: Fixed-price contracts are 'normally preclude[d];' 'fixed-price incentive ... contracts should be considered.'" Accordingly, any failure on the part of the government to comport with advisory statements in the special ordering procedures is not actionable.

In view of this court's conclusion that the government was under no obligation to solicit CGI for the subject delivery order, it is irrelevant that: (1) "CGI had expressed strong interest to officials at OASD(HA) its [sic] desire in competing on the delivery order;" (2) CGI's performance rating was "5" out of a possible "5," (3) CGI would have been able to quickly turn around the RFQ; and (4) in CGI's view the government lacked a "rational or even consistent story as to why it did not send CGI the RFQ." Plaintiff's Opposition at 5, 6, 8. This is so because the government comported with all of the requirements applicable to this FSS delivery order. And even assuming, *arguendo,* that the government did not comply with the directives in the special ordering procedures, the government's actions cannot be deemed arbitrary and capricious for failing to follow non-mandatory procedures.

### IV. Plaintiff's Allegations of Improper "Steering" of Contract Award and Government Bias and Improper Coordination with Other Contractors

In count III of its complaint, Cybertech argues that in violation of FAR 3.101-1, Mr. Gary Thomas failed to act impartially and provided preferential treatment for Intellidyne by "steering" the contract award to it and requesting that SEALOG not solicit CGI at all, despite the fact that CGI was a "well-rated, highly performing incumbent." Compl. ¶ 55. Plaintiff avers these actions were not rational and reasonable. *Id.*

FAR 3.101-1, upon which plaintiff bases count III, provides:

> Government business shall be conducted in a manner above reproach and, except as authorized by statute or regulation, with complete impartiality and with preferential treatment for none. Transactions relating to the expenditure of public funds require the highest degree of public trust and an impeccable standard of conduct. The general rule is to avoid strictly any conflict of interest or even the appearance of a conflict of interest in Government-contractor relationships. While many Federal laws and regulations place restrictions on the actions of Government personnel, their official conduct must, in addition, be such that they would have no reluctance to make a full public disclosure of their actions.

In count IV, CGI alleges that Mr. Gary Thomas of OASD(HA), acting in coordination with Mr. Fred Peters, a consultant to his office: (1) took intentional actions of bias against CGI; (2) actively sought to harm it as a contractor by denying it the opportunity to compete for the work it was performing, and (3) prevented the SEALOG contracting office from soliciting the TMA IT work from CGI. Compl. ¶ 56. It further alleges that these actions were taken in an attempt to make CGI no longer a viable business entity. *Id.*

██ Significantly, there is myriad case law in this court and the Federal Circuit to establish that "it requires 'well-nigh irrefragable proof' to induce the court to abandon the presumption of good faith dealing" traditionally afforded to the government. *Torncello v. United States,* 231 Ct.Cl. 20, 681 F.2d 756, 770 (1982). To establish "irrefragable proof" the *plaintiff* must show evidence of "some specific intent to injure the plaintiff." *Id.* (emphasis added). *See also LaMear v. United States,* 9 Cl.Ct. 562, 570, *aff'd,* 809 F.2d 789 (Fed.Cir.1986) (Table), (citing *Wood v. Carpenter,* 101 U.S. (11 Otto) 135, 143, 25 L.Ed. 807 (1879)). Proof of government wrongdoing must be based upon "hard facts,"

not "suspicion or innuendo." *CACI, Inc.- Federal v. United States,* 719 F.2d 1567, 1569–82 (Fed.Cir.1983). The type of government actions that have been deemed to rise to the level of this specific intent include those " 'motivated alone by malice;' " *Gadsden v. United States,* 111 Ct.Cl. 487, 78 F.Supp. 126, 127 (1948); " 'actuated by animus toward the plaintiff;' " *Kalvar Corp. v. United States,* 211 Ct.Cl. 192, 543 F.2d 1298, 1302 (1976); and those the government enters "with no intention of fulfilling its promises," *Krygoski Constr. Co. v. United States,* 94 F.3d 1537, 1545 (Fed.Cir.1996).

■ Throughout its opposition to defendant's motion to dismiss counts I and II, and pre-trial brief in support of its request for preliminary and permanent injunctions, plaintiff repeatedly argues that Intellidyne should be entitled to relief because:

> Despite CGI's expressed strong interest in competing for the delivery order, despite the fact that CGI's performance rating was "5" out of a possible "5," despite CGI being able to quickly turn around the RFQ, and despite the fact that the Navy only received one quote, the Navy did not send CGI an RFQ. Failing to send CGI the RFQ was completely irrational and highly suspect.

Plaintiff's Opposition at 8.

Plaintiff's allegations that government activity was "highly suspect" are, however, insufficient to rise to the level of bad faith, absent the requisite "well-nigh irrefragable" proof. Plaintiff does proffer serious allegations in its complaint, but has failed to demonstrate any substantiated evidence of bad faith. This court is aware of the serious nature of these allegations, and, accordingly, it permitted plaintiff to take five depositions and engage in limited discovery. Even following discovery, and at a hearing before the court with witness testimony, plaintiff was still unable to offer any evidence of bad faith conduct on the part of the government.

The evidence set forth by CGI, primarily testimony presented by plaintiff's president, Mr. Roger Sigley, has failed to persuade the court of any improper steering, government bias, or improper coordination alleged by CGI. The testimony of Col. Garry Stanberry and Mr. Gary Thomas persuades the court that these two individuals were genuinely displeased with CGI's performance. While it is unclear whether CGI was, in fact, solely responsible for the two network outages which created significant problems for the Government, the court does credit the testimony of Col. Garry Stanberry and Mr. Gary Thomas that they both reasonably believed that CGI was at fault and that CGI did not handle the network crashes well. Likewise, Mr. Keith Simmons testified that it was CGI's culpability in the October 2000 network crash which resulted in his initial lowering of CGI's rating from a 5 to a 3. Neither Mr. Gary Thomas nor Col. Garry Stanberry was involved in nor aware of Mr. Keith Simmons' initial rating of CGI.

Although CGI has contended that Mr. Gary Thomas was the individual who "steered" the delivery order to Intellidyne, it is undisputed that it was Col. Garry Stanberry, and not Mr. Gary Thomas, who made the determination not to seek a quote from CGI for the disputed delivery order. Col. Garry Stanberry testified that he made the decision to look for another contractor other than CGI due to the two network crashes and what Col. Garry Stanberry considered to be a lack of professionalism on the part of Mr. Roger Sigley during an incident between Mr. Gary Thomas and Mr. Roger Sigley in which Mr. Roger Sigley reportedly cursed Mr. Gary Thomas. Col. Garry Stanberry also testified that, at the time he made the determination not to solicit a quote from CGI, he was unaware that Mr. Fred Peters and CGI were engaged in any employment discussions. Again, the court credits Col. Garry Stanberry's testimony and determines that his actions were rational, with no bad faith motivations encompassed therein. Col. Garry Stanberry and Mr. Gary Thomas both gave credible testimony that they had no financial interest in Intellidyne, and Intellidyne's president, Mr. Robert Grey, testified that neither Mr. Fred Peters, Mr. Gary Thomas, Col. Garry Stanberry nor Mr. Keith Simmons had any financial interest in Intellidyne. Accordingly, in light of the foregoing, this court finds that CGI's contentions concerning improper steering, government bias

and improper coordination are without foundation and that plaintiff has failed to demonstrate bad faith on the part of any government official.[6]

## V. Count V (Unlawful Sole Source Competition)

■■■ CGI alleges that in violation of 10 U.S.C. § 2304, 41 U.S.C. § 253(c), and FAR Subpart 6.3 (most particularly FAR 6.302–1), the Navy conducted a "sham" competition which constructively amounted to a sole-source procurement to Intellidyne, without obtaining the necessary Justifications and Approvals required in FAR 6.303 and FAR 6.304. Compl. ¶ 57. It further alleges that these actions were not rational and reasonable. Id.

As discussed supra, because GSA has awarded the contractors indefinite delivery contracts or "schedules" using competitive procedures, agencies are not required to obtain competition and determine reasonable prices, except as GSA's special ordering procedures may require. FAR 8.404; 8.402. The FAR makes clear that by definition a delivery order placed against a GSA supply schedule satisfies the requirements of competition, and is not a sole source award. FAR 8.404 provides:

> Orders placed pursuant to a Multiple Award Schedule (MAS), using the procedures in this subpart, are considered to be issued pursuant to full and open competition[ ]. Therefore, when placing orders under the Federal Supply Schedules, ordering offices need not seek further competition, synopsize the requirement, make a separate determination of fair and reasonable pricing, or consider small business programs.

FAR 8.404. See also 10 U.S.C. § 2302(2)(C); 41 U.S.C. § 259(b)(3) (stating that the term "competitive procedures" includes the procedures established by GSA for the multiple award schedule program if (i) participation in the program has been open to all responsible sources; and (ii) orders and contracts under such program result in the lowest overall cost alternative to meet the needs of the United States).

In this case, the delivery order at issue was placed in accordance with FAR Part 8 and the GSA special ordering procedures. The contracting officer transmitted the request to four contractors. This act is entirely consistent with the advisory procedures for transmitting the request to contractors set forth in part 3(a)(2)(i)-(ii) of the GSA Terms and Conditions Applicable to Information Technology (IT) Professional Services (Special Item Number 132–51). See discussion supra. Part 3(a)(3) of these special ordering procedures concerning evaluation of responses and selection of contractor to receive the order, provides: "After responses have been evaluated against the factors identified in the request, the order should be placed with the schedule contractor that represents the best value. (See FAR 8.404)." In this case, Intellidyne was the only recipient of an RFQ who elected to submit a quote. AR at 48; 86; 88. The contracting officer stated:

> The requirements of FAR 8.404(b)(2) have been met by requesting quotes from other schedule holders. The technical representative has reviewed and evaluated the quotes received and determined that the quote from the contractor provides best value. The contractor discounted their [sic] GSA rates by 0 to 33%. Based upon this analysis, I hereby determine that the total time and materials quote from the contractor is fair and reasonable.

AR at 100.

Thus, the agency's actions in conjunction with this delivery order are entirely consistent with FAR Part 8 and the special ordering procedures. For all the foregoing reasons, the delivery order that is the subject of this case is not an unlawful sole source competition.

---

6. While this court finds that the government's rationale for opting not to solicit a quote was rational and not based on bad faith, the court observes that even if this were not the case, the government was under no more of an obligation to solicit a quote from CGI than it was to solicit the other 1,800 contractors on this FSS. As discussed supra. the government was not required to submit an RFQ to the incumbent contractor in this case and its decision to award this delivery order to Intellidyne cannot be overturned on that basis.

## VI. Count VI (Failure to Conduct a Best Value Analysis); Count VII (Failure to Make Award to Lowest Overall Cost Alternative)

As concluded above, CGI is not an "interested party" under section 1491(b)(1) of the Tucker Act, and therefore lacks jurisdiction to bring counts VI and VII. But assuming, *arguendo,* that CGI is an "interested party," counts VI and VII are legally unavailing.

In count VI of its complaint, CGI contends that in violation of FAR 8.404, the Navy failed to conduct a best value analysis before making award to Intellidyne. Compl. ¶ 58. It further contends these actions were not rational and reasonable. *Id.* In count VII of its complaint, CGI contends that the Navy violated FAR 8.404 by making an award to Intellidyne that did not provide the lowest overall cost alternative for the services sought in the RFQ, and that this action was not rational and reasonable. Compl. ¶ 59.

FAR 8.402 provides:

Procedures in this subpart apply to Federal Supply Schedule contracts. Occasionally, special ordering procedures may be established. In such cases the procedures will be outlined in the "Federal Supply Schedules."

Pursuant to this FAR provision, the procedures applicable to this delivery order are those contained in the GSA FSS Schedule 70 contract under the terms and conditions applicable to Special Item Number (SIN) 132–51 for IT services. As to ordering procedures for services requiring a Statement of Work, the special ordering procedures provide:

FAR 8.402 contemplates that GSA may occasionally find it necessary to establish special ordering procedures for individual Federal Supply Schedules or for some Special Item Numbers (SINs) within a Schedule. GSA has established special ordering procedures for services that require a Statement of Work. *These special ordering procedures take precedence over the procedures in FAR 8.404(b)(2) through (b)(3).*

GSA has determined that the prices for services contained in the contractor's price list applicable to this Schedule are fair and reasonable. However, the ordering office using this contract is responsible for considering the level of effort and mix of labor proposed to perform a specific task being ordered and for making a determination that the total firm-fixed price or ceiling price is fair and reasonable.

(a) When ordering services, ordering offices shall—

(1) Prepare a Request (Request for Quote or other communication tool):

\*    \*    \*    \*    \*    \*

(2) Transmit the Request to Contractors:

(i) Based upon an initial evaluation of catalogs and price lists, the ordering office *should* identify the contractors that appear to offer the best value (considering the scope of services offered, pricing and other factors such as contractors' locations, as appropriate). When buying IT professional services under SIN 132–51 ONLY, the ordering office, at its discretion, may limit consideration to those schedule contractors that are small business concerns. This limitation is not applicable when buying supplies and/or services under other SINs as well as SIN 132–51. The limitation may only be used when at least three (3) small businesses that appear to offer services that will meet the agency's needs are available, if the order is estimated to exceed the micro-purchase threshold.

(ii) The request *should* be provided to three (3) contractors if the proposed order is estimated to exceed the micro-purchase threshold, but not exceed the maximum order threshold. For proposed orders exceeding the maximum order threshold, the request should be provided to additional contractors that offer services that will meet the agency's needs. Ordering offices should strive to minimize the contractors' costs associated with responding to requests for quotes for specific orders. Requests should be tailored to the minimum

654

level necessary for adequate evaluation and selection for order placement. Oral presentations should be considered, when possible.

(3) Evaluate Responses and Select the Contractor to Receive the Order:

After responses have been evaluated against the factors identified in the request, the order *should* be placed with the schedule contractor that represents the best value.

AR at 147–50 (emphasis added).

The section of the special ordering procedures concerning evaluation of responses and selection of the contractor to receive the order unambiguously states that "the order *should* be placed with the schedule contractor that represents the best value." AR at 150 (emphasis added). In this case, the contracting officer's actions complied with this section of the ordering procedures for two reasons: (1) the section is couched in purely advisory terms; and (2) even assuming the directives are mandatory, the contracting officer performed an adequate "best value" determination. The administrative record reflects at least a minimally adequate best value determination that comports with the special ordering procedures. Mr. Francis Duggan, the contracting officer, stated:

The unit prices contained in this order were negotiated under the terms of a GSA schedule. In accordance with FAR 8.404(a), the prices of a GSA Schedule are determined to be fair and reasonable at the time of GSA contract award. The requirements of FAR 8.404(b)(2) have been met by requesting quotes from other schedule holders. The technical representative has reviewed and evaluated the quotes received and determined that the quote from the contractor provides best value. The contractor discounted their [sic] GSA rates by 0 to 33%. Based upon this analysis, I hereby determine that the total time and materials quote from the contractor is fair and reasonable.

AR at 100.

Accordingly, this court finds that the contracting officer complied with the section of the special ordering procedures concerning evaluation of responses and selection of the contractor to receive the order.

In support of its argument that the agency did not perform a price reasonableness determination, plaintiff relies upon the same section of the special ordering procedures as it did for its best value argument, with like results. As in the case of the agency's best value analysis, the court likewise finds that although there was no requirement that it do so, the government performed an adequate price reasonableness determination. As previously stated, the contracting officer specifically determined that Intellidyne had discounted its rates, which were already determined by regulation to be fair and reasonable, between 0 to 33%. This determination by the contracting officer, in the court's opinion, satisfies any requirement of a price reasonableness determination. Although of questionable relevance at the outset, CGI's argument that its prices were lower than Intellidyne's is completely unpersuasive since these were, in fact, two separate delivery orders and therefore, CGI's prices on its delivery order cannot properly be compared to Intellidyne's delivery order for purposes of a price reasonableness determination.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that:

(1) Plaintiff's motion for declaratory and injunctive relief is **DENIED**.

(2) Defendant's and intervenor-defendant's motions to dismiss the amended complaint are **GRANTED** and the Clerk of the Court is directed to enter judgment for the defendant.

(3) On or before **February 9, 2001**, counsel for each party shall **FILE** with the Clerk's Office a redacted copy of this Opinion, with any material deemed proprietary marked out in brackets, so that a copy of the Opinion can then be prepared and made available in the public record of this matter.

(4) Except as **GRANTED** in (2), all other relief sought in this matter is **DENIED**. No costs.

**IT IS SO ORDERED.**